# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### AT COVINGTON
### CASE NO. _____

| | | |
|---|---|---|
| **TEEANNA J. POLONCZYK** | : | |
| **2748 Alexandria Ave.** | : | |
| **Latonia, Kentucky 41015** | : | **Judge** |
| **PLAINTIFF** | : | _____ |
| **v.** | : | |
| | : | |
| **ANTHEM BLUECROSS AND BLUESHIELD** | : | **Magistrate Judge** |
| **120 Monument Cir.** | : | _____ |
| **Indianapolis, IN 46204** | : | |
| | : | |
| **SERVE:** | : | **COMPLAINT AND** |
| **CT Corporation System** | : | **JURY DEMAND** |
| **306 W. Main St., Ste. 512** | : | |
| **Frankfort, KY 40601** | : | |
| | : | |
| **ANTHEM UM SERVICES, INC.** | : | |
| **220 Virginia Ave.** | : | |
| **Indianapolis, In 46204** | : | |
| | : | |
| **SERVE:** | : | |
| **CT Corporation System** | : | |
| **306 W. Main St., Ste. 512** | : | |
| **Frankfort, KY 40601** | : | |
| | : | |
| **PLANS ADMINISTRATION COMMITTEE** | : | |
| **OF CITIGROUP, INC.** | : | |
| **1 Court Square, 46th Floor** | : | |
| **Long Island City, NY 11120** | : | |
| | : | |
| **SERVE:** | : | |
| **General Counsel** | : | |
| **Citigroup, Inc.** | : | |
| **388 Greenwich St.** | : | |
| **New York, NY 10013** | : | |
| | : | |
| **CITIGROUP HEALTH BENEFIT PLAN** | : | |
| **750 Washington Blvd., 8th Floor** | : | |
| **Stamford, CT 06901** | : | |
| | : | |

```
SERVE:                                              :
      General Counsel                               :
      Citigroup, Inc.                               :
      388 Greenwich St.                             :
      New York, NY 10013                            :
                                                    :
CITIGROUP, INC.                                     :
750 Washington Blvd., 8th Floor                     :
Stamford, CT 06901                                  :
                                                    :
SERVE:                                              :
      General Counsel                               :
      Citigroup, Inc.                               :
      388 Greenwich St.                             :
      New York, NY 10013                            :
                                                    :
CITIBANK, N.A.                                      :
3800 Citigroup Center Dr.                           :
Tampa, FL 33610                                     :
                                                    :
SERVE:                                              :
      Office of the Kentucky Secretary of State     :
      700 Capitol Ave., Ste. 152                    :
      Frankfort, KY 40601                           :
                                                    :
                              DEFENDANTS.           :
```

Plaintiff, TeeAnna J. Polonczyk, for her causes of action against Defendants, states as follows:

## NATURE OF ACTION

1.    Plaintiff TeeAnna Polonczyk ("Polonczyk") brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") and Section 1557 of the Affordable Care Act against Defendants, Citigroup, Inc., Citibank, N.A., Citigroup Health Benefit Plan, Plans Administration Committee of Citigroup, Inc., Anthem BlueCross BlueShield, and Anthem UM Services, Inc.

2.    Plaintiff seeks compensatory and equitable relief pursuant to the above referenced statutes as redress for injuries suffered by Plaintiff as a result of Defendants' acts or omissions,

resulting in breach of fiduciary duties, and, alternatively, the denial of medically necessary healthcare benefits to which she was entitled.  Plaintiff further alleges interference with protected rights.  Plaintiff brings these claims pursuant to 29 U.S.C. §§ 1132(a)(1), 1132(a)(3), 1140, and 42 U.S.C. § 18116.

## JURISDICTION AND VENUE

3.   Jurisdiction of the Court is based upon ERISA, and, in particular, 29 U.S.C. §§ 1132(e)(1) and 1132(f).  These provisions give the district courts jurisdiction to hear civil actions brought to recover benefits due under the terms of an Employee Welfare Benefit Plan that, in this case, consists of group healthcare benefits available under a Plan that is provided to the employees of Citibank, N.A., also a Defendant. Citigroup Health Benefit Plan, ChoicePlan 500 (Plan Number 508) (hereinafter referred to as "the Plan"), is attached hereto and incorporated as Exhibit A.

4.   This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff's claims arise under the laws of the United States.

5.   Venue in this District is appropriate because Defendants may be found here and because most or all of the events giving rise to the claims asserted herein occurred in this District.

6.   ERISA statute provides at 29 U.S.C. § 1133 a mechanism for administrative or internal appeal of benefit denials.  Plaintiff Polonczyk has exhausted those appeals.

## PARTIES

7.   Plaintiff, TeeAnna Polonczyk, ("Polonczyk") is a resident and citizen of Kenton County, Kentucky.  At all relevant times, she has been employed by Citibank, N.A., ("Citibank") a subsidiary of Citigroup, Inc. ("Citigroup"), is an active employee under the Plan, is eligible

as a qualified employee, and received medical benefits pursuant to an employee welfare benefit plan within the meaning of 29 U.S.C. § 1003.

8.  Defendant Citibank is, at all relevant times, Plaintiff's "employer" and a "person," as defined by 29 U.S.C. §§ 1002(5), (9).  Citibank also acted as a functional fiduciary.

9.  Defendant Citigroup offers its Plan to its employees in the state of Kentucky.  At all relevant times, Citigroup is the Plan Sponsor for Plaintiff's Employee Welfare Benefit Plan, a functional fiduciary, and a "person" as defined by 29 U.S.C. §§ 1002(9).

10.  Defendant, Citigroup Health Benefit Plan ("Plan"), constituted an "Employee Welfare Benefit Plan" as defined by 29 U.S.C. § 1002(1).  Plaintiff has coverage under the Plan as an employee because she is a participant as defined by 29 U.S.C. § 1002(7).

11.  Defendant, Plans Administration Committee of Citigroup, Inc. ("Committee") transacts interstate business in the state of Kentucky.  At all relevant times, the Committee is a named administrator of the Plan, as defined by 29 U.S.C. § 1002(16)(A), for Plaintiff's Employee Welfare Benefit Plan, a named fiduciary, and a "person" as defined by 29 U.S.C. §§ 1002(9).

12.  Defendant, Anthem BlueCross BlueShield ("BCBS") transacts interstate business, including within the state of Kentucky.  At all relevant times, Defendant BCBS was the Claims Administrator for Plaintiff's Employee Welfare Benefit Plan, a functional fiduciary, a "person" as defined by 29 U.S.C. §§ 1002(9), and a covered entity for purposes of Section 1557.

13.  Defendant, Anthem UM Services, Inc. ("AUMSI") transacts interstate business, including within the state of Kentucky.  At all relevant times, Defendant AUMSI was the Claims Administrator for Plaintiff's Employee Welfare Benefit Plan, a functional fiduciary, a

4

"person" as defined by 29 U.S.C. §§ 1002(9), and a covered entity for purposes of Section 1557.

## STATEMENT OF THE CASE

**Polonczyk and the Plan.**

14. Polonczyk is a full-time Citibank employee.  Polonczyk elected to receive healthcare benefits through the Plan.  As such, Polonczyk was, at all relevant times, a beneficiary and participant under the Plan.

15. Polonczyk was designated male at birth and has been clinically diagnosed with Gender Dysphoria, recognized in the DSM-V as 302.65/F 64.1.  In 2011, she began taking steps to transition her body from male to female by undergoing various medical procedures recommended by her physicians as medically necessary to alleviate symptoms of Gender Dysphoria and to transition from male to female.

16. BCBS offers and administers an insurance policy, known as "ChoicePlan 500," to employers, including Citigroup and Citibank. The policy is incorporated into the Plan.

17. On January 15, 2019, Polonczyk visited her Primary Care Physician, Dr. Walters, for a pre-operation exam in advance of "facial surgery" to be completed on February 12, 2019.

**Adverse Employment Actions Corresponding to Polonczyk's Claim for Benefits.**

18. In January 2019, Polonczyk wore a maroon business dress, pantyhose, a sweater, and accessories to work.  During a meeting with Matt Crouch, her immediate supervisor, Sandy Krieling criticized the fact that Polonczyk wore this dress.  Ms. Krieling was not Polonczyk's immediate supervisor.

19. Later that same week, Polonczyk was called to meet in a corner office in her department.  Two supervisors were present in this meeting: Matt Crouch and Nicole Apodaca.  Ms.

Apodaca was not Polonczyk's direct supervisor.  Mr. Crouch was aware of Polonczyk's transgender status and that she sought additional feminization procedures to complete her transition.

20.   Polonczyk was told that the maroon dress she wore earlier in the week was too short and not in compliance with Citibank and Citigroup dress code.  Polonczyk offered to provide a copy of the dress code, but the supervisors would not review it.

21.   For around an hour, Polonczyk was lectured on "how a woman should dress." It was suggested that Polonczyk wear dresses at home, not at work.  Polonczyk was asked if she was trying to "test the system" and felt she was being treated like a crossdresser, not a woman.

22.   Multiple other women in her department who did not request to undergo or had completed any sex reassignment surgeries wore dresses and were not lectured on how a woman should dress, were not asked to wear leggings under their dresses, and were not told that they should wear dresses at home, but not to work.

23.   Emotionally stunned by this interaction, feeling threatened, frustrated, and angry, Polonczyk began to cry. She left the meeting, resumed her work, but later went to the restroom to cry in private.  Multiple co-workers asked if Polonczyk was okay, but she was so upset that she took two hours of unplanned leave and went home early.

24.   Polonczyk reported this discriminatory conduct to Human Resources on or about January 21 or 22, 2019.

**Polonczyk submits Pre-Certification for Surgery and is Then Placed on Leave During Human Resources Investigation**

25. On or about January 22, 2019, a precertification request was submitted by Dr. William Tobler for services for Polonczyk, including: (1) Rhytidectomy - Cheek, Chin, & Neck (15828); (2) Rhytidectomy – Neck with Platysmal Tightening (15825); (3) Repair Brow Ptosis (67900); (4) Osteoplasty - Facial Bones Reduction (21209); (5) Genioplasty – 2/> Sliding Osteotomies (21122); (6) Osteoplasty – Facial Bones Augmentation (21208); and (7) Tissue Grafts – Other (20926). The precertification included, but was not limited to, a photograph of Polonczyk and a letter from her therapist, June Huelskamp, LISW-S.

26. Mr. George Davis, a Citibank, N.A. Human Resources generalist, replied to Polonczyk's complaint of discrimination on January 23, 2019. Polonczyk followed up with him via email, including that the Crouch/Apodaca meeting left her feeling "embarrassed" and "humiliated" and that her job was threatened during the meeting.

27. On January 31, 2019, Polonczyk spoke with her therapist about the emotional harm this meeting caused her, and she informed her supervisor, Mr. Crouch, that she had done so. She continued seeing her therapist about the humiliation she experienced and became immensely fearful at work, fearing that she would be terminated or chastised and humiliated again.

28. On or about January 31, 2019, Ms. Cathy Nichols, Human Resources Manager with Citigroup, contacted Polonczyk to discuss Polonczyk's complaints. When Polonczyk told Nichols that Polonczyk was working through the trauma with her therapist, Nichols advised Polonczyk "not to bring any third parties" into it.

29. Nichols allegedly began an investigation, during which time Polonczyk was placed on a paid leave of absence from work from January 26, 2019 to February 6, 2019. Nichols' calls to

7

discuss Polonczyk's complaints became an investigation into Polonczyk's personal Facebook posts, alleged sexual conversations, and accusations of threats against Mr. Crouch.

## Polonczyk's Claims for Benefits

30. On or about February 6, 2019, BCBS/AUMSI began its Initial Clinical Review. Polonczyk's diagnosis was listed as F 64.0 – Transsexualism. She sought authorization for the following facial feminization procedures: (1) Rhytidectomy - Cheek, Chin, & Neck (15828); (2) Rhytidectomy – Neck with Platysmal Tightening (15825); (3) Repair Brow Ptosis (67900); (4) Osteoplasty - Facial Bones Reduction (21209); (5) Genioplasty – 2/> Sliding Osteotomies (21122); (6) Osteoplasty – Facial Bones Augmentation (21208); and (7) Tissue Grafts – Other (20926). These internal notes are attached hereto and incorporated as Exhibit B.

31. Internal BCBS/AUMSI notes show alleged review of the precertification using the "Medical Policy" and/or "Clinical UM Guidelines," which are not Plan terms, but are instead, external to the Plan.

32. For the two Rhytidectomy procedures, internal notes show BCBS/AUMSI allegedly reviewed the Medical Policy entitled "Cosmetic and Reconstructive Services of the Head and Neck," Document Number ANC.00008, a BCBS document, not included within the Plan.

33. For the Brow Ptosis procedure, internal notes show BCBS/AUMSI allegedly reviewed the Clinical UM Guideline for CG-SURG-03, a BCBS document, not included within the Plan.

34. For the Osteoplasties and Genioplasty procedures, internal notes show BCBS/AUMSI allegedly reviewed the Clinical UM Guideline for CG-SURG-84, a BCBS document, not included within the Plan.

8

35.     For the Tissue Graft procedure, internal notes show BCBS/AUMSI allegedly reviewed the Medical Policy entitled "Growth Factors, Silver-based Products and Autologous Tissues for Wound Treatment and Soft Tissue Grafting," Document Number MED.00110, a BCBS document, not included within the Plan.

36.     Policy required, and Polonczyk was aware, that a decision on whether the procedures would be approved or denied was due "no later than 15 days after receipt of the claim." As such, this decision was due no later than February 6, 2019. Polonczyk's surgical procedures were scheduled for February 12, 2019.

37.     On February 7, 2019, Dr. Tobler's office contacted BCBS/AUMSI requesting an update on the status of the precertification. The precertification was still pending.

38.     On February 8, 2019, internal notes show BCBS/AUMSI allegedly reviewed Clinical Guideline for CG-SURG-27, a BCBS document, not included within the Plan, which stated that Blepharoplasties (eyelid surgery), Brow Lifts, Facial Bone Reconstruction, and/or Jaw Reduction/Jaw Contouring are "considered cosmetic when used to improve the gender specific appearance of an individual who has undergone or is planning to undergo sex reassignment surgery." No comment was made regarding the tissue grafts.

39.     The day before her scheduled surgery, having been off of her hormones for weeks in preparation for the surgery, and having heard nothing regarding the status of the approval, Polonczyk called the hospital to check in. The pre-certification nurse, Amber, informed Polonczyk that she too had not yet received the decision to approve or deny the precertification, despite her attempts at calling for updates.

40.     On February 11, 2019, five days past the required deadline, and without issuing Plaintiff a notice of the adverse benefits determination, and without having contacted any of

Polonczyk's doctors for a peer-to-peer evaluation, BCBS/AUMSI internally noted that the request was denied as "cosmetic and not medically necessary" "based on […] CG-SURG-27."

41.  Polonczyk's medically necessary procedures were canceled.

42.  The Plan covered her pre-op appointments surrounding her February 12, 2019 surgery date, yet rejected approval of the actual surgical procedure.

43.  The Plan "does cover procedures, treatments and related services designed to alter a participant's physical characteristics from his or her biologically determined sex to those of another sex," and includes, "Transgender benefits are covered under the plan."

44.  By March 19, 2019, Polonczyk sought therapy for increased gender dysphoria regarding her facial features, stating she felt "singled out" and "discriminated against," causing her much distress.

45.  Upon information and belief, by March 27, 2019, no appropriate peer-to-peer evaluation with Dr. Tobler, any member of Polonczyk's care team, or any medical professional specializing in transgender related healthcare, had been completed.

46.  On April 9, 2019, Polonczyk again sought therapy for gender dysphoria, stating she continues to be singled out and discriminate against at work, she felt, due to her facial features.

**Receipt of Notice of Denial**

47.  Having not received any written or electronic notice that the procedures were denied, on or about April 14, 2019, Polonczyk's Health Advocate (provided as a benefit by Citigroup and Citibank) called BCBS/AUMSI to check the status of the preauthorization.  The Health Advocate was told that the procedures were denied.

48.    A written denial of the procedures was sent to Polonczyk sometime in late March or early April but backdated to February 11, 2019.  The backdated notice is attached and incorporated herein as Exhibit C.

49.    The backdated notice of the adverse determination failed to advise Polonczyk about how her information fell short of meeting the medical necessity definition of the Plan, including specific plan provisions on which the determination was based, or a discussion of the claims denial decision.

**Governing Plan Documents Specific to Gender Reassignment**

50.    The controlling ERISA Plan document/policy defines includes that gender reassignment surgery is considered medically necessary when *all* of the following criteria are met:

- The individual is at least 18 years of age;
- The individual has the capacity to make fully informed decisions and consent for treatment; and
- The individual has been diagnosed with gender dysphoria and exhibits all of the following:
    - The desire to live and be accepted as a member of the opposite sex, usually *accompanied by the wish to make his or her body as congruent as possible* with the preferred sex through surgery and hormone treatment;
    - The transsexual identity has been present persistently for at least two years;
    - The disorder is not a symptom of another mental disorder; and
    - The disorder causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.
- For individuals without a medical contraindication, the individual has undergone a minimum of 12 months of continuous hormonal therapy when recommended by a mental health professional and provided under the supervision of a physician; and
- Documentation is provided showing that the individual has completed a minimum of 12 months of successful, continuous full-time real-life experience in their new gender, across a wide range of life experiences and events that may occur throughout the year […]. This includes coming out to partners, family, friends and community members […]; and
- The individual has undergone regular participation in psychotherapy throughout the real-life experience when recommended by a treating medical or behavioral health practitioner and
- […]

- Two referrals from qualified mental health professionals who have independently assessed the individual are presented […].

51. The controlling ERISA Plan document/policy includes that "Gender reassignment surgery is not considered medically necessary when one or more of the criteria above has not been met."

52. Polonczyk meets all of the criteria for gender reassignment surgery, as outlined in the Plan, and as such, her procedures meet the Plan's requirements for medical necessity.

53. The Plan provides no definition limiting "gender reassignment surgery" to genital surgery.

54. The controlling ERISA Plan document/policy then lists surgeries which are "considered cosmetic and not medically necessary *when used to improve the gender-specific appearance* of a *patient who has undergone or is planning to undergo gender reassignment surgery*."

55. This list of exclusions includes procedures clinically recommended for treatment of gender dysphoria, a condition which only includes transgender or transexual persons.

56. The controlling ERISA Plan document/policy defines "cosmetic surgery" as follows: "Medically unnecessary surgical procedures, usually, but not limited to, plastic surgery directed toward preserving beauty or correcting scars, burns or disfigurements."

57. The backdated notice further excluded review procedures and the time limits applicable to such procedures, evidenced by internal BCBS/AUMSI notes (Exhibit B), showing that Polonczyk called on April 29, 2019 and "wanted to know about appeals and how long she has to file with them and how to get an extension. Asked caller to look on her appeals letter to locate number caller states there is no number on the letter…"

58. This notice is not consistent with the requirements under the Plan or the statute. 29 U.S.C. § 1104(a)(1)(D) requires that the Plan be administered according to the governing Plan

documents. This letter also did not comply with the applicable regulations stated above. 29 C.F.R. § 503-1(g)(i-v).

**Continued Adverse Job Actions and Alleged Peer-to-Peer Review**

59.   In May 2019, Polonczyk was placed on a Performance Improvement Plan ("PIP").  She had never previously been placed on any PIP or received any formal discipline.  Prior to the denial of the procedures and the humiliating meeting with Mr. Crouch and Ms. Apodaca, Polonczyk's performance reviews were positive, her customer surveys were positive, and her 'judge performance' was positive.  Further, Polonczyk had always received her annual raise.

60.   During this PIP, other supervisors, not her own, began to unfairly review and criticize Polonczyk's performance.

61.   Because she continued to experience significant emotional distress in her department as a result of the treatment described herein, and because she feared additional retaliation and discrimination, Polonczyk repeatedly requested a transfer out of her department.   In requesting the change, Polonczyk specifically addressed the humiliating meeting and its subsequent effects as reasons for needing to switch departments.  Polonczyk felt she needed to work with employees who knew as little about her transition process as possible in order to feel comfortable at work again.

62.   On May 9, 2019, Polonczyk requested to transfer to another department and was denied.

63.   On or about May 21, 2019, BCBS/AUMSI called Polonczyk to "discuss denial information" and informed her that a peer-to-peer was done on March 15, 2019.  (Exhibit B).

64.   However, this "peer-to-peer" review has not been provided, and no internal BCBS/AUMSI notes confirm any peer-to-peer evaluation.  No written notice providing any detail supporting

13

why the "denial was upheld" was issued to Polonczyk or internally documented by any Defendant.  This also did not comply with the applicable regulations under 29 C.F.R. § 2650.503-1, *et seq*.

**Polonczyk's Additional Complaint to Human Resources and "Level One" Appeal**

65.   In early June 2019, Polonczyk submitted yet another complaint to Human Resources due to the delayed transfer request, her ongoing struggles of the lasting traumatic effects of the above-described treatment, the denial of her medically necessary procedures, and the mishandling of her claim for benefits.

66.   Despite the deficient notice of the denial, on or about June 25, 2019, Polonczyk submitted her notice of appeal.

67.   In July 2019, Polonczyk was transferred from the Credit Department to the Collections Department.

68.   On July 2, 2019, Polonczyk submitted her appeal.  She first countered the Plan's language, emphasizing that the procedures were not to "improve gender specific appearance," but that instead, the procedures were medically necessary "to complete [her] transition by changing male facial parts."  She stated, "I have a female body, it's the facial features [that] need to be transitioned," and "I am not trying to look prettier.  There are a number of procedures I could be submitting for that are cosmetic.  I am looking to complete my body as female.  To complete my transition.  This is a medical need for me.  For my medical and emotional well being."  She continued, "I am a woman and started the process and now, as stated by Anthem, I need the process of my transition completed."

69.   She complained that "The complete statement as cited about [sic] was not read and considered when making the decision."

14

70.   She specifically pointed out language in CG-SURG-27 supporting the inclusion of her procedures as part of "sex reassignment surgery": "*Sex reassignment surgery is not a single procedure, but part of a complex process involving multiple medical, psychiatric, and surgical specialists working in conjunction with each other and the individual* to achieve successful behavioral and medical outcomes."  CG-SURG-27 also states, "The selection of appropriate procedures *should be based on the needs of the individual* in relation to the treatment of his or her diagnosis of gender dysphoria."

71.   She reiterated that no one from her care team was contacted to discuss the medical necessity of the procedures.  Dr. Tobler provided specific time slots on at least three days, but he was not contacted on any of those days.  She further complained about the delay in pre-certification, pointing out that her pre-certification nurse had to call Anthem for a decision.

72.   She specifically complained of discrimination, stating that just "[b]ecause [she] is a transitioning female does not mean [she] [does] not deserve the same timeliness as stated in my policy and that my surgeon does not deserve the basic courtesies non-trans patients receive," and, "I would appreciate a quick decision as this process has been dragged out by Anthem staff since February and the stress levels and anxiety are increasing."

73.   She described the increased anxiety and stress of using female locker rooms and restrooms while still possessing male facial features.  Further harms listed included: inconsistent blood pressure; sleepless nights; severe acid reflux; extreme stress at work; increased anxiety; and depression.  She identifies that stress can kill, and that transition procedures reduce stress in transgender persons.  She stated that temporary remedies would, in fact, cause long-term, recurring expenses.

15

74.   She also included summaries of care provided and letters from four members of her health care team, including her primary physician, plastic surgeon, hormone treatment doctor, and her therapist, who have "known and observed the improvement transition has done for [her] health."   Polonczyk included that she has a "supporting informed medical staff that can answer any questions."   Their letters conclude that, in their clinical judgment and historic and ongoing treatment of Polonczyk's gender dysphoria, including her transition, these procedures are medically necessary to alleviate symptoms of gender dysphoria through completion of her transition from male to female, that the facial feminization procedures were consistent with the generally accepted standards of gender dysphoria treatment under the World Professional Association for Transgender Health ("WPATH"), and that the procedures were clinically appropriate in terms of the nature and condition of Plaintiff's diagnosis and symptomatologies.

75.   One provider, Dr. Taylor, explained the harassment and discrimination Polonczyk faced as a result of her transgender status, including, "Her colleagues at work have noted her currently coarse facial features that have given away her transgender status."

76.   Dr. Taylor specifically identified and provided a hyperlink to a 2016 WPATH Policy Statement, issued by WPATH's 14-member Board of Directors, which includes M.D.s, Ph.D.s, and an M.A.  The document, entitled, "Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A," states, "[M]edically necessary gender affirming/confirming surgical procedures are described in section XI of the SOC.  These procedures include […] certain facial plastic reconstruction […] as appropriate to the patient."  The statement is attached herein, as Exhibit D.

77. It continues: "Non-genital surgical procedure are routinely performed… notably, […] facial feminization surgery […] in male-to-female transsexuals.  These surgical interventions are often of greater practical significance in the patient's daily life than reconstruction of the genitals."

78. Continuing, it states, "It is important to understand that every patient will not have a medical need for identical procedures.  Clinically appropriate treatments must be determined on an individualized and contextual basis, *in consultation with the patient's medical providers*. The medical procedures attendant to gender affirming/confirming surgeries are not 'cosmetic' or 'elective' or 'for the mere convenience of the patient.'  These reconstructive procedures are not optional in any meaningful sense but are understood to be medically necessary for the treatment of the diagnosed condition."  It also includes a statement that these "treatments are cost effective rather than cost prohibitive."

79. June Huelskamp, LISW-S, specifically identified in her 2019 letter that "Teeanna's *physical masculinity has not enabled her to wholly live in a way that is congruent* with her female identity" and explained, with consent, that Polonczyk has experienced adverse interactions in several settings due to her masculinity.

80. Polonczyk added, "My surgery is not cosmetic you've provided no clinical evidence that I am using it to improve my gender specific appearance and not part of my transition where I have provided you with evidence, documents and letters from my healthcare team from qualified doctors in trans medicine and my personal health care and improvements."

81. The contents of Polonczyk's Level One appeal is contained within a later grievance, which is dated September 9, and attached herein and incorporated as Exhibit E.

**Denial Issued to Polonczyk**

82.     On or about July 24, 2019, BCBS/AUMSI upheld its decision to deny coverage and internally cited the denial rationale as "not medically necessary." (Exhibit B).

83.     A notice issued to Polonczyk on July 24, 2019 stated that the surgeries were denied as cosmetic and thus not medically necessary. The decision was allegedly based on UM Clinical Guideline CG-SURG-27 and a review conducted by an external Plastic Surgery MD consultant and an Anthem Medical Director, certified in Family Medicine, not in Transgender related healthcare.  (Exhibit F).

84.     The July 24, 2019 notice of the adverse determination failed to advise Polonczyk about how her information fell short of meeting the medical necessity definition of the Plan.  It failed to include specific Plan provisions on which the determination was based.  Instead of providing a discussion of the claims denial decision for each of the seven requested procedures, it improperly references them as one procedure, "facial feminization surgery."  This term does not appear in the Plan.

85.     Then, on July 25, 2019, Polonczyk was sent another letter, which repeated July 24, 2019 denial that the procedures are "considered cosmetic.   Thus, they are not medically necessary." (Exhibit G).

86.     However, rather than citing the Plan's definition of "cosmetic and not medically necessary," (contained with the Plan's "Covered Services" section regarding "Transsexual Surgery, Sex Change or Transformation"), or "not medically necessary," (identified above at Paragraph 37, which is also contained within the Plan's "Covered Services" section regarding "Transsexual Surgery, Sex Change or Transformation"), this denial cited the Plan's broad definition of "medically necessary," (appearing in the Glossary) which reads, "Health care

services and supplies that are determined by the Claims Administrator to be medically appropriate and: (a) Necessary to meet the basic health needs of the covered person; (b) Rendered in the most cost-efficient manner and type of setting appropriate for the delivery of the service or supply; (c) Consistent in type, frequency, and duration of treatment with scientifically based guidelines of national medical, research or health care coverage organizations or governmental agencies that are accepted by the Plan; (d) Consistent with the diagnosis of the condition; (e) Required for reasons other than the convenience of the covered person or his or her physician; (f) Must be provided by a physician, hospital or other covered provider under the Plan; (g) With regard to an inpatient, it must mean the patient's illness or injury requires that the service or supply cannot be safely provided to that person on an outpatient basis; (h) Not be primarily scholastic, vocational, educational, developmental, experimental, or investigational in nature; and (i) Demonstrated through prevailing peer-reviewed medical literature to be either: (1) Safe and effective for treating or diagnosing the condition or sickness for which their use is proposed; or (2) Safe with promising efficacy: (2a) For treating a life-threatening sickness or condition; (2b) in a clinically controlled research setting; and (2c) Using a specific research protocol that meets standards equivalent to those defined by the National Institutes of Health. (Exhibits A and G).

### Polonczyk Submits Grievance to BCBS/AUMSI

87.   On August 9, 2019, Polonczyk was informed by her Health Advocate that the second level appeal "is external and is handled by CITI."

88.   On September 7, 2019, Polonczyk submitted a 31-page grievance. (Exhibit E).  She challenged both the cosmetic and medical necessity denials with additional documentation

19

and explanation. Like in her July appeal, she expressed concern for discrimination, and again mentioned the portion of Guideline (which acknowledged that sex reassignment surgery is part of a "complex process"), stating that, "WILFULLY [sic] IGNORING A PART OF A POLICY DOES NOT MAKE THE COVERAGE NOT AVAILABLE."  She specifically states, "this is not cosmetic and not to make me look prettier" and, "it is a part of transition."

89.   She also submitted another letter from a provider, Dr. McClung, the surgeon who completed her vaginoplasty, which further supported the medical necessity of the procedures to alleviate her gender dysphoria.

90.   On September 25, 2019, the denial of benefits was upheld, citing the rationale that, "No indication on all information received that the surgery was addressing a condition that met the criteria for reconstructive or medical rationales for surgery as defined in the Anthem medical policies." (Exhibit H).

91.   Like the July 25 denial, instead of providing a discussion of the denial decision for each of the seven requested procedures, it improperly referenced them as one procedure: "facial feminization surgery."  The decision excludes any specific review of Polonczyk's request for coverage for Rhytidectomy - Cheek, Chin, & Neck (15828), Rhytidectomy – Neck with Platysmal Tightening (15825); Osteoplasty - Facial Bones Reduction (21209); Genioplasty – 2/> Sliding Osteotomies (21122); Osteoplasty – Facial Bones Augmentation (21208); and Tissue Grafts – Other (20926).

92.   Also like the July 25 notice, this notice cited the broad definition of "cosmetic surgery," despite the fact that the Plan's definitions state that definitions within the Glossary "apply to benefits provided under the Citigroup Health and Benefit Plan, unless clearly indicated otherwise."  The Plan "clearly indicates otherwise" by including a more specifically targeted

definition of "cosmetic" within the Plan section regarding "Transsexual Surgery, Sex Change or Transformation").

## Polonczyk Submits "Level Two" Appeal and Issuance of Final Adverse Benefits Determination

93. On November 9, 2019, Polonczyk submitted a "Level Two" Appeal (containing 36 pages) specifically requesting coverage for "facial feminization surgery, including osteoplasty of the facial bones with reduction, tissue graft, osteoplasty facial bone augmentation, rhytidectomy cheek, chin, and neck, genioplastia, repair of brow ptosis, and rhytidectomy of the neck with platysmal tightening and all other procedures submitted in original precertification request." She asked that the reviewer "please read carefully this time as your latest denial shows the reviewer did not completely review and only reviewed one procedure which has caused further delay for my procedures which is causing me more stress and anxiety." (Exhibit I).

94. She reiterated that the surgeries are not cosmetic and are medically necessary to complete her transition. She pleads for an expert transgender provider to review her file. She included yet another letter from a member of her care team, Dr. Sherman Leis, a transition surgeon, who provided a second medical opinion in support of a previous gender confirmation surgery. His opinion on this previous gender-affirming procedure had been considered by Defendants in its earlier decision to cover the removal of Polonczyk's facial hair "in order to achieve congruence with the female gender."

95. She further discussed the adverse mental and emotional harms suffered due to the dysphoria, including discrimination, harassment, high-risk behaviors, high blood pressure, and trauma.

She highlighted that the cost of the procedures far outweighs the cost of ongoing treatment if her dysphoria went untreated.

96.   On December 9, 2019, Polonczyk was sent the final adverse benefits decision.  It cited, for the first time, all specific facial feminization surgery codes.  It then included CG-SURG-27 and listed all procedures considered "cosmetic when used to improve the gender specific appearance of an individual who has undergone […] sex reassignment surgery."  It states the requested procedures were considered cosmetic, thus, not medically necessary.  (Exhibit J).

**Additional Adverse Employment Action**

97.   In December 2019, Polonczyk received her annual employment review by her employer. Because Polonczyk had spent half of the previous year in the Credit Operations department, her performance review was partly based on her time in Credit Operations.  This evaluation was based in large part on information provided by Mr. Crouch and Mr. Waler Ray Lykins who had previously been involved in the discriminatory, harassing, and retaliatory conduct described above and had knowledge of Polonczyk's transgender status and claim for benefits. This evaluation significantly reduced her performance ratings, despite the fact that her performance met or exceeded any reasonable job expectations.

98.   Polonczyk was then denied her annual raise, while other women who did not request coverage for any sex reassignment surgeries or diagnosed with gender dysphoria were not denied their annual raise.

99.   Polonczyk submitted a request for an Independent External Review on April 7, 2020, which was denied as untimely, despite Polonczyk's Health Advocate (provided by her employer) written confirmation that the final day to submit an External Review to BCBS was April 9, 2020.

100.  At various times, from January 22, 2019 to May 2020, Polonczyk regularly communicated with her Health Advocate regarding her claims, including but not limited to, her pre-certification, denials, grievances, and appeals.  On a call with Health Advocate Michele Salute and Salute's director, Polonczyk complained about Defendants' handling of her claim. She was informed that the Health Advocates had reported Polonczyk's concerns to Defendants.

101.  Plaintiff is entitled to these benefits.  They are due and owing to the Plaintiff in an amount not yet ascertainable.   However, Plaintiff seeks payment of benefits in the usual and customary amount for the medically necessary procedures.

### COUNT I
### (ERISA – 29 U.S.C. § 1132(a)(1)(B) – Denial of Benefits)
### (Against All Defendants)

102.  Plaintiff incorporates all factual allegations set out above.

103.  ERISA mandates that an Employee Benefit Plan shall be established and maintained pursuant to a written instrument, 29 U.S.C. § 1102(a)(1).

104.  Under the clear terms of the Plan document, a policy of insurance, the denial of payment of healthcare benefits was unreasonable and without legal basis under the Plan document and is not a reasoned decision based on substantial, reliable evidence.

105.  Defendants wrongfully denied the claims submitted by Plaintiff based upon policies and practices that they developed that are inconsistent with the relevant terms of the health insurance plan and ERISA.

106.  The policy of insurance/Plan was sold in Kentucky and is subject to the statutes and regulations of the state of Kentucky.

107.  Plaintiff requests that this Court review the Plan and declare the rights of those parties to the policy.

108.  Plaintiff has been harmed by Defendants' improper benefit denial, as she was deprived of insurance benefits she was owed.

109.  Plaintiff is entitled to these benefits and seeks to recover the benefits due to her under the Plan, or, alternatively, seeks to enforce her rights under the terms of the Plan.

### COUNT II
**(ERISA – 29 U.S.C. § 1132(a)(3) - Breach of Fiduciary Duties)**
**(Against Defendants Citigroup, Inc., Citibank, N.A., Plans Administration Committee of Citigroup, Inc., Anthem BlueCross BlueShield, and Anthem UM Services, Inc.)**

110.  Plaintiff incorporates all factual allegations set out above.

111.  29 U.S.C. § 1004(a), requires that a fiduciary discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and fiduciaries and defraying reasonable expenses of administering the plan, and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with other provisions of ERISA.

112.  Defendants have breached its fiduciary duties to Plaintiff by failing to exercise the statutorily required duty of care and prudence, failing to administer the Plan solely in the interests of the participants and beneficiaries and by denying benefits to the Plaintiff, contrary to the law, applicable regulations, and terms of the Plan.

113.  This Court must give a full de novo review of this decision and the evidence in the claim file and may not abrogate its statutory duty to do so because a plenary review is required.  Failure

to give such a review would deprive Plaintiff of her Constitutional rights, violate the U.S. Constitution, particularly, Article III.

114. Defendants are required the analyze the claims and the appeals with care, skill, prudence, and diligence, solely in the claimant's interest, according to the terms of the Plan. Defendants have failed in their duties of care to investigate Plaintiff's claim thoroughly. Defendants have arbitrarily ignored documents Plaintiff submitted. In addition, the denials by Defendants have failed to use the specific Plan language for medical necessity and/or cosmetic surgeries.

115. As the entities responsible for making benefit determinations under Plaintiff's health insurance plan, and responsible for developing the internal practices and policies that are applied to such determinations, Defendants are ERISA fiduciaries.

116. Notwithstanding their fiduciary obligations, these Defendants developed and relied upon internal practices and policies that improperly restricted coverage in contravention of Plaintiff's health insurance plan and ERISA, violating their fiduciary obligations.

117. Further, Defendants' have breached their fiduciary duties by delaying the processing of Polonczyk's pre-certification submission and failing to provide an answer in response to Polonczyk's multiple inquiries as to whether her procedures would be approved, and not providing an answer until the day before the scheduled procedures.

118. Plaintiff is, therefore, entitled to compensatory damages from Defendants based on 29 U.S.C. § 1132(a)(3), which authorizes appropriate equitable relief for the purpose of redressing any violations or enforcing any provisions of an ERISA plan.

## COUNT III
### (ERISA – 29 U.S.C. § 1140 – Interference with Protected Rights)
### (Against Defendants Citigroup, Inc., Citibank, N.A., Plans Administration Committee of Citigroup, Inc., Anthem BlueCross BlueShield, and Anthem UM Services, Inc.)

119.   Plaintiff incorporates all factual allegations set out above.

120.   No requirement for administrative exhaustion is required to bring a claim under 29 U.S.C. § 1140 in this Circuit.

121.   While Plaintiff was pursuing coverage and challenging adverse benefits determinations for medically necessary treatment for gender dysphoria through her employer's self-funded Plan, of which her supervisor was aware, Polonczyk was subjected to adverse employment actions.

122.   Plaintiff received no similar adverse employment actions prior to pursuing coverage for procedures relating to sex reassignment procedures, which are sought only by transgender persons, a protected group under ERISA.

123.   Defendants have disciplined and discriminated against Polonczyk, a Plan participant and beneficiary, for exercising rights to which she is entitled under the provisions of the Plan.

124.   Such discipline and discrimination was administered based on Plaintiff's sex, with intent to deprive her of her healthcare benefits.

## COUNT IV
### (Affordable Care Act – 42 U.S.C. § 18116, Section 1557 – Discriminatory Benefits)
### (Against Defendants Citigroup, Inc., Citibank, N.A., Plans Administration Committee of Citigroup, Inc., Anthem BlueCross BlueShield, and Anthem UM Services, Inc.)

125.   Plaintiff incorporates all factual allegations set out above.

126.   Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557"), provides that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.)" – which prohibits

discrimination "on the basis of sex" – "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

127. Based on information and belief, Defendant BCBS sells insurance on the federally run Marketplace in Kentucky.  As a result, it receives federal financial assistance, and is therefore a "covered entity" for purposes of Section 1557.

128. Although not an exhaustive list, the regulations define discrimination to include "categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition" or to"[o]therwise deny or limit coverage, deny or limit coverage of a claim, or impose additional cost sharing or other limitations or restrictions on coverage, for specific health services related to gender transition if such denial, limitation, or restriction results in discrimination against a transgender individual." 45 C.F.R. § 92.207(b)(4) & (5).

129. BCBS's policy, incorporated in Citigroup and Citibank's Plan, excludes otherwise medically necessary surgeries for patients who have "undergone or are planning to undergo gender reassignment surgery," which is and operates as a "categorical coverage exclusion or limitation for all health services related to gender transition" as defined by 45 C.F.R. § 92.207(b)(4).

130. Discrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of "sex" under Section 1557.

131. By categorically excluding medically necessary care related to "gender reassignment surgery," Defendant BCBS has drawn a classification that discriminates based on transgender status and gender non-conformity.

132. Because the only individuals who require medically necessary care to treat gender dysphoria are transgender individuals, denying coverage for such health care constitutes discrimination based on transgender status.  As a result of the exclusion in BCBS's policy, non-transgender employees receive coverage for all of their medically necessary healthcare, but transgender individuals do not.

133. The policy also discriminates against Plaintiff by covering the medically necessary procedures she requires for other medical conditions, but not gender dysphoria.

134. By excluding healthcare related to "gender reassignment surgery" from the policy and Plan, BCBS has unlawfully discriminated against Plaintiff—and continues to discriminate against her—on the basis of sex in violation of Section 1557.

**WHEREFORE,** Plaintiff TeeAnna Polonczyk demands judgment against Defendants Anthem BlueCross and BlueShield, Anthem UM Services, Inc., and Citigroup Health Benefit Plan, Citigroup, Inc., Citibank, N.A., and Plans Administration Committee of Citigroup, Inc. as follows:

(a) That the Court enter judgment in favor of Plaintiff and that the Court order Defendants to account for and award healthcare benefits to Plaintiff in an amount to which Plaintiff is entitled under the terms of the Plan;

(b) That the Court enter judgment accordingly and reserve jurisdiction to enforce the equitable decree;

(c) That the Court order all equitable relief available to Plaintiff;

(d) That the Court declare Polonczyk's rights under the ERISA Plan, the ERISA statute, and the applicable Kentucky insurance laws and order Defendants to pay

28

Polonczyk's benefits and this is perfected by an Order of this Court under 29

U.S.C. § 1132(a)(3)(A) and (B);

(e)     That the Court award Plaintiff her attorney's fees and costs pursuant to 29 U.S.C.

§ 1132(g); and

(f)     That Plaintiff be awarded all other legal and equitable relief to which she may be

entitled, as well as the costs of suit.


Respectfully submitted,

/s/ Jessica N. Wimsatt
JESSICA N. WIMSATT (KY Bar No. 98646)
MICHAEL J. O'HARA (KY Bar No. 52530)
O'HARA, TAYLOR, SLOAN & CASSIDY
25 Town Center Boulevard, Suite 201
Covington, Kentucky   41017
jwimsatt@oharataylor.com
mohara@oharataylor.com
(859) 331-2000
FAX: (859) 578-3365

**ATTORNEYS FOR PLAINTIFF**


**JURY DEMAND**

Pursuant to Federal Rule 38, Plaintiff herewith demands that all issues of fact in the
foregoing Complaint be tried to a jury.

/s/ Michael J. O'Hara
MICHAEL J. O'HARA
O'HARA, TAYLOR, SLOAN & CASSIDY