UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 20-176-DLB-CJS

TEEANNA J. POLONCZYK                                                                       PLAINTIFF

v.                     **MEMORANDUM OPINION AND ORDER**

**ANTHEM BLUECROSS AND BLUESHIELD, et al.**                           **DEFENDANTS**

* *  * *  * *  * *  * *  * *  * *  * *

## I.     INTRODUCTION

This matter is before the Court on Defendants' Motion to Dismiss. (Doc. # 26). Defendants' Motion has been fully briefed (Docs. # 34 and 43), and is now ripe for review. For the reasons set forth herein, Defendants' Motion (Doc. # 26) will be **GRANTED**.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On December 9, 2020, Plaintiff Teeanna Polonczyk filed a Complaint alleging a number of claims under the Employee Retirement Income Security Act ("ERISA") and the Affordable Care Act against Defendants Anthem BlueCross and BlueShield and Anthem UM Services, Inc.[1] related to Defendants denial of benefits owed to Plaintiff. (Doc. # 1).

Plaintiff Polonczyk was assigned the male gender at birth and has been clinically diagnosed with Gender Dysphoria as an adult. (Doc. # 30 ¶ 15). Since 2011, Plaintiff has undergone medical procedures to transition from male to female. (*Id.*). In 2019, Plaintiff, who is employed by Citibank, N.A., sought healthcare benefits for facial surgery

---

[1]   Citigroup Health Benefit Plan, Citigroup, Inc., Citibank, N.A., and Plans Administration Committee of Citigroup, Inc. were also named as Defendants but were dismissed by Agreed Order on June 21, 2021. (Doc. # 42).

to assist in her transition under her employer-sponsored plan entitled "ChoicePlan 500" ("the Plan").  (*Id.* ¶¶ 15, 25).  Plaintiff's Plan generally "does cover procedures, treatments and related services designed to alter a participant's physical characteristics from his or her biologically determined sex to those of another sex."  (Doc. # 1-1 at 137).

Plaintiff's facial surgery was supposed to be completed on February 12, 2019 by Dr. William Tobler, following a pre-operation exam on January 15, 2019, conducted by Plaintiff's primary care physician, Dr. Walters.  (Doc. # 1 ¶¶ 17, 25).  Following this visit, Dr. Tobler submitted a pre-certification request regarding Plaintiff's facial surgeries, which allows the insurer an opportunity to determine whether a specific medical procedure is necessary or covered by the insured's policy.  (*Id.* ¶ 25).  That pre-certification request outlined the following procedures that were supposed to be performed: (1) Rhytidectomy—Cheek, Chin, & Neck, (2) Rhytidectomy—Neck with Platysmal Tightening, (3) Repair Brow Ptosis, (4) Osteoplasty—Facial Bones Reduction, (5) Genioplasty—Sliding Osteotomies, (6) Osteoplasty—Facial Bones Augmentation, and (7) Tissue Grafts—Other.  (*Id.* ¶ 30).

Plaintiff's pre-certification request was ultimately denied following a multi-step review process.  On February 6, 2019, Defendants Anthem BlueCross and Blue Shield and Anthem UM Services, Inc. ("Defendants") performed an Initial Clinical Review on Dr. Tobler's precertification request.  (*Id.* ¶ 30).  During this review, Defendants referenced a document entitled "Clinical Guideline for CG-SURG-27," which states that "[t]he following procedures are considered cosmetic when used to improve the gender specific appearance of an individual who has undergone or is planning to undergo sex reassignment surgery, including, but not limited to, the following: Blepharoplasty[,] Brow

2

lift[,] Facial bone reconstruction[, and] Jaw reduction (jaw contouring)." (Doc. # 1-2 at 10). Based on this document, the physician reviewer determined that the procedures requested by Dr. Tolber were not approvable under the plan criteria because "[w]hile it may change appearance it does not improve health." (*Id.*). On February 11, 2019, Defendants internally denied Plaintiff's pre-certification request and cancelled her surgery, without issuing Plaintiff an adverse benefits determination. (Doc. # 1 ¶¶ 40-41). Defendants did not contact any of Polonczyk's doctors to perform a peer-to-peer evaluation at that time. (*Id.* ¶ 45).

According to Plaintiff, she finally received a written denial of the procedures in late March or early April, but the notice was purportedly backdated to February 11, 2019. (Docs. # 1 ¶ 48 and 1-3 at 1). This notice did not include information regarding review procedures or the timing of such procedures. (Doc. # 1 ¶ 57). On May 21, 2019, Defendants informed Polonczyk that her peer-to-peer review was completed on March 15, 2019. (*Id.* ¶ 63). On or about June 25, 2019, Plaintiff submitted her notice of appeal and on July 2, 2019, she submitted her actual appeal to Defendants. (*Id.* ¶¶ 66, 68). On July 24, 2019, Plaintiff received notice that Defendants upheld their decision to deny coverage of her facial surgeries due to the procedures being considered "cosmetic" and therefore "not medically necessary." (Docs. # 1 ¶¶ 82-83 and 1-6 at 1).

Thereafter, on September 7, 2019, Polonczyk submitted an additional appeal where she challenged Defendants previous denials of her benefits. (Docs. # 1 ¶¶ 87-88 and 1-5). On September 25, 2019, the denial of benefits was again upheld because Defendants "believe[d] this surgery [was] not medically necessary for [her]" and "[was] considered cosmetic." (Doc. # 1-8 at 2). On November 9, 2019, Polonczyk submitted a

3

level two appeal to Defendants. (Doc. # 1-9). Ultimately, on December 9, 2019, Defendants issued a final denial of Plaintiff's benefits, again considering the surgeries to be "not medically necessary" and "cosmetic." (Doc. # 1-10). Plaintiff filed the complaint following that denial.

## III. ANALYSIS

### A. Motion to Dismiss

#### 1. *Standard of Review*

Granting a motion to dismiss is appropriate if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Further, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In order to have "facial plausibility," the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Id.*) (quoting *Twombly*, 550 U.S. at 556). In evaluating a motion to dismiss, a court should "construe the complaint in the light most favorable to the plaintiff" and "accept all well pleaded factual allegations as true." *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017) (citing *Ashcroft*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570). However, "mere conclusory statements, do not suffice" and legal conclusions "must be supported by factual allegations." *Ashcroft*, 556 U.S. at 678-79.

#### 2. *Plaintiff's ERISA Claim under 29 U.S.C. § 1132(a)(1)(B)*

Plaintiff first brings an ERISA claim under 29 U.S.C. § 1132(a)(1)(B) alleging that Defendants wrongly denied her claim for benefits without a basis in the Plan document.

(Doc. # 1 ¶¶ 102-109).  Section 1132(a)(1)(B) provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to [her] under the terms of [her] plan, or to clarify [her] rights to future benefits under the terms of the plan."  Where the ERISA plan at issue gives the administrator "discretionary authority to determine eligibility for benefits or construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the Court reviews the decision under the arbitrary and capricious standard.  *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 545 (6th Cir. 2020).[2] Under the arbitrary and capricious standard, the plan administrator's decision only needs to be rational "in light of the plan's provisions."  *Calvert v. Firststar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).  Therefore, "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious."  *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)).

First, the arbitrary and capricious standard applies because the Plan document provides the administrator discretionary authority to interpret the terms of the Plan.  The Plan specifically states: "the Plan Administrator and the Claims Administrator have the full discretionary authority to construe and interpret the provision of the Plans."  (Doc. # 1-1 at 303).

The Plan serviced by Anthem BlueCross BlueShield specifically contemplates "[g]ender reassignment surgery." (Doc. # 1-1 at 138-139).  The Plan dictates that gender

---

[2]  Plaintiff's argument that this Court should review the denial of her benefits under the de novo standard of review due to procedural irregularities is unpersuasive.  (Doc. # 34 at 12-16). "[P]rocedural errors do not convert the standard of review from arbitrary and capricious to de novo," and instead, these errors come into play when deciding whether the denial of benefits was arbitrary and capricious. *Bio-Med. Applications of Ky., Inc. v. Coal Exclusive Co., LLC.*, 782 F. Supp. 2d 438, 442 (E.D. Ky. 2011).

5

reassignment surgery may include the following procedures: (1) Orchiectomy, (2) Penectomy, (3) Vaginoplasty, (4) Clitoroplasty, and (5) Labiaplasty. (*Id.* at 139). It also specifically lists a number of surgeries that "are considered cosmetic and not medically necessary when used to improve the gender-specific appearance of a patient who has undergone or is planning to undergo gender reassignment surgery: [1] Reduction thyroid chondroplasty; [2] Liposuction; [3] Rhinoplasty; [4] Facial bone reconstruction; [5] Face-lift; [6] Blepharoplasty; [7] Voice modification surgery; [8] Hair removal/hairplasty; and [9] Breast augmentation." (*Id.* at 140). The Plan further explains that "[c]osmetic surgery or surgical procedures primarily for the purpose of changing the appearance of any part of the body to improve appearance or self-esteem" are not covered. (*Id.* at 141-142).

Plaintiff sought benefits for the following surgeries: (1) Rhytidectomy—Cheek, Chin, & Neck, (2) Rhytidectomy—Neck with Platysmal Tightening, (3) Repair Brow Ptosis, (4) Osteoplasty—Facial Bones Reduction, (5) Genioplasty—Sliding Osteotomies, (6) Osteoplasty—Facial Bones Augmentation, and (7) Tissue Grafts—Other. (Doc. # 1 ¶ 30). Most of these surgeries explicitly fall under the Plan document's "cosmetic and not medically necessary" surgeries, while none of the surgeries fall under the covered gender reassignment procedures. (Doc. # 1-1 at 138-140). Cosmetic surgeries are defined in the Plan as "[m]edically unnecessary surgical procedures, usually, *but not limited to*, plastic surgery directed towards preserving beauty or correcting scars, burns or disfigurements." (Doc. # 1-1 at 315) (emphasis added). Plaintiff argues that her surgeries are not cosmetic in nature, but instead are "medically necessary to complete [her] transition by changing male facial parts," which she considers necessary for her "medical and emotional well-being." (Doc. # 34 at 7) (internal quotations omitted) (alteration in

6

original).  Polonczyk's treating doctors also opined that the procedures were "medically necessary to alleviate symptoms of gender dysphoria through completion of her transition from male to female . . . ." (*Id.* at 8).

While Plaintiff may challenge the definition of "cosmetic" under the Plan, unfortunately, the Plan document is clear—gender reassignment surgeries are covered benefits, while surgeries to improve gender specific appearance are not. (Doc. # 1-1 at 138-140).  Two of Plaintiff's requested surgeries were Rhytidectomies. (Doc. # 1 ¶ 30). A Rhytidectomy is commonly known as a facelift, a surgery explicitly listed as not medically necessary in Plaintiff's Plan. (Doc. # 1-1 at 140); *see* CLEVELAND CLINIC, *Facelift (Rhytidectomy)*, https://my.clevelandclinic.org/health/treatments/11023-facelift (last visited February 18, 2022).  Plaintiff also requested the following surgeries: Osteoplasty—Facial Bones Reduction, Genioplasty—Sliding Osteotomies, and Osteoplasty—Facial Bones Augmentation. (Doc. # 1 ¶ 30). As noted in Plaintiff's request, Osteoplasty refers to facial bone surgery. (*Id.*).  Genioplasty is a surgery meant to alter or reshape a patient's chin. UNIVERSITY OF MICHIGAN HEALTH, *Chin Surgery (Genioplasty)*, https://www.uofmhealth.org/conditions-treatments/surgery/plastic/cosmetic/facial/chin, (last visited February 18, 2022).  Each of these requested surgeries are some form of facial bone reconstruction that is explicitly listed as not medically necessary in Plaintiff's Plan. (Doc. # 1-1 at 140).

Two of the surgeries requested by Plaintiff were not *explicitly* listed as cosmetic and therefore not covered under Plaintiff's Plan.  First, Plaintiff requested benefits for Repair Brow Ptosis. (Doc. # 1 ¶ 30).  Repair Brow Ptosis is meant to correct brow ptosis, "the descent of the eyebrow from its normal anatomical position down to a point at which

7

its appearance is cosmetically displeasing, or visual field deficits develop as a result of excess soft tissue pushing downwards on the eyelid." Russell De Jong & Marc H. Hohman, *Brow Ptosis*, StatPearls [Internet] (November 22, 2021), https://www.ncbi.nlm.nih.gov/books/NBK560762/. Defendants denied Plaintiff's request for Repair Brow Ptosis because this procedure is only medically necessary if it causes interference with vision, and Plaintiff could not meet this standard. (Doc. # 1-10 at 2-3). Next, Plaintiff requested Tissue Grafts—Other. (Doc. # 1 ¶ 30). Tissue grafts, in the context of facial reconstruction, are typically used to "rebuild structures of the face." JOHNS HOPKINS MEDICINE, *Facial Reconstruction*, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/facial-reconstruction (last visited February 23, 2022). Therefore, the tissue grafts were likely requested to assist with the facial surgery. Because the underlying facial surgeries were not approved, this necessitates a finding that the tissue grafts were also related to the cosmetic facial surgeries and therefore medically unnecessary.

Although the delay in alerting Polonczyk that pre-certification for these surgeries was denied was not compliant with the Plan document, this alone is not enough to make Defendants' decision arbitrary and capricious. Ultimately, this Court must determine whether Defendants' decision was rational "in light of the plan's provisions." *Calvert*, 409 F.3d at 292. As explained above, not only was the decision rational, but it was based in the plain text of the Plan document. The Plan document provides that certain surgeries in the context of gender reassignment are considered cosmetic and therefore not covered. Regardless of Plaintiff's objection, the Plan gives the administrators the latitude to make such a determination, and in making that determination, the administrators

8

lawfully acted within the scope of the ERISA plan.

### 3. Plaintiff's ERISA Claim under 29 U.S.C. § 1132(a)(3)

Plaintiff next asserts a breach of fiduciary duty claim under 29 U.S.C. § 1132(a)(3). (Doc. # 1 ¶¶ 110-118). Plaintiff argues that Defendants failed "to exercise the statutorily required duty of care" and failed "to administer the Plan solely in the interests of the participants and beneficiaries and by denying benefits to the Plaintiff." (*Id.* ¶ 112).

Unfortunately for Plaintiff, this type of claim is typically barred because Supreme Court and Sixth Circuit precedent limits "the applicability of § 1132(a)(3) to beneficiaries who may not avail themselves of § 1132's other remedies[,]" such as § 1132(a)(1)(B). *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996)); *see also Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 838-40 (6th Cir. 2007) (collecting cases). Therefore, where § 1132(a)(1)(B) allows a plaintiff to bring a claim for denial of benefits, "a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3) [is] not appropriate." *Gore*, 477 F.3d at 839. After the Sixth Circuit's decision in *Wilkins*, it clarified that § 1132(a)(1)(B) and § 1132(a)(3) claims may be brought together in a narrow circumstance—where "an award of individual benefits pursuant to § 1132(a)(1)(B) could not provide an adequate remedy for the alleged injury to the plaintiffs caused by the breach of fiduciary duties along," such as when the claims seek plan-wide injunctive relief instead of an individual benefit determination. *Gore,* 477 F.3d at 840 (citing *Hill v. Blue Cross and Blue Shield of Mich.*, 409 F.3d 710, 718 (6th Cir. 2005)). In other words, if the § 1132(a)(3) claim is "duplicative" or simply a "repackaged benefits claim", it cannot be brought. *Id.* at 838, 841.

The language in Plaintiff's Complaint makes clear that her § 1132(a)(3) claim is simply a repackaged benefits claim. The Complaint directly alleges that Defendants breached their fiduciary duty by failing "to administer the Plan solely in the interests of the participants and beneficiaries and *by denying benefits to the Plaintiff*." (*Id.* ¶ 112) (emphasis added). Plaintiff also states that Defendants breached their fiduciary duties "by delaying the processing of Polonczyk's pre-certification submission and failing to provide an answer in response to Polonczyk's multiple inquiries as to whether her procedures would be approved, and not providing an answer until the day before the scheduled procedures." (*Id.* ¶ 117). As explained by the Supreme Court, the "remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and payment of claims" is provided by § 1132(a)(1)(B). *Varity Corp.*, 516 U.S. at 512; *see also Gore*, 477 F.3d at 841 ("Had Gore alleged that Liberty breached its fiduciary duty, pursuant to § 1132(a)(3), for wrongful denial of benefits, under *Wilkins* the claim would be duplicative of his § 1132(a)(1)(B) claim."). Similarly, Plaintiff's claims do not seek to obtain the type of plan-wide injunctive relief contemplated in *Hill*. 409 F.3d at 718. Because her claims can ultimately be brought (and have been brought) under § 1132(a)(1)(B), thus representing repackaged denial of benefits claims, Plaintiff's claim under § 1132(a)(3) is dismissed.

### 4.   *Plaintiff's ERISA Claim under 29 U.S.C. § 1140*

Plaintiff includes a number of allegations in her Complaint related to discrimination she suffered during her employment at Citibank. However, the Citibank Defendants were previously dismissed from this lawsuit. (*See* Doc. # 41). Furthermore, Plaintiff's discrimination claims against Citibank are currently proceeding in this Court in a separate

lawsuit. *See* Complaint, *Polonczyk v. Citibank, N.A.*, No. 2:21-cv-59 (E.D. Ky. May 5, 2021), ECF No. 1. Plaintiff acknowledges in her Response to Defendants' Motion to Dismiss that Count III was inadvertently asserted against Defendants and was only supposed to be asserted against the Citibank Defendants, who have already been dismissed. (Doc. # 34 at 23). Therefore, Plaintiff's claim under 29 U.S.C. § 1140 is dismissed.

### 5. *Plaintiff's Affordable Care Act Claim under 42 U.S.C. § 18116*

Finally, Plaintiff asserts a claim against Defendants under 42 U.S.C. § 18116 alleging that Defendants discriminated against Plaintiff on the basis of sex. (Doc. # 1 ¶¶ 125-134). Section § 18116 provides that "an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975 . . . be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

Defendants argue that because the Plan provided by Citibank to Polonczyk does not receive "Federal financial assistance," Defendants cannot be liable for a violation of 42 U.S.C. § 18116. (Doc. # 26 at 10). The Court is inclined to agree, because even assuming *arguendo* that the Plan receives federal funds—which is a lofty assumption— Plaintiff still fails to state a claim for discrimination under § 18116. To state a claim under § 18116, Plaintiff must show that Defendants discriminated on the grounds outlawed by one of the listed statutes. Here, Plaintiff argues that Defendants discriminated against her under Title IX of the Education Amendments of 1972. (Doc. # 1 ¶ 126). Title IX's discrimination section, codified at 20 U.S.C. § 1681, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the

11

benefits of, or be subjected to discrimination under any education program or activity received Federal financial assistance." To make out a claim under Title IX, a plaintiff is required to show that "the defendant discriminated against him or her because of sex; that the discrimination was intentional; and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." *Ohio Nurses Ass'n v. Ashtabula Cnty. Med. Ctr.*, No. 1:20-CV-1656, 2020 WL 4390524, at *5 (N.D. Ohio July 31, 2020) (quoting *Weinreb v. Xerox Bus. Servs., LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 521 (S.D. N.Y. 2018)).

Plaintiff cannot prove that she was discriminated against because of her sex. First, Plaintiff makes no allegations of intentional discrimination by Defendants. (*See* Doc. # 1 ¶¶ 125-134). Instead, she asserts that "the factual allegations in the complaint are sufficient to *infer* intentional discrimination." (Doc. # 34 at 24) (emphasis added). Plaintiff is correct that within the context of Title IX, a Complaint must allege "sufficient factual allegations to satisfy *Twombly* and *Iqbal* in alleging the required element of discriminatory intent." *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018). However, Plaintiff fails to identify any documents or actions that support a finding that Plaintiff was discriminated against because of her transgender status. Instead, she asserts that "she repeatedly informed Anthem of the discriminatory consequences that she was suffering as a direct result of Anthem's denials," and Anthem "completely ignore[d] [the] discriminatory effects it knew Plaintiff was suffering." (Doc. # 34 at 24). This assertion, standing alone with no additional facts, is not sufficient for the Court to infer intentional discrimination. If anything, the fact that Anthem was informed by Polonczyk, *after* denying her benefits, that this was leading to "discriminatory consequences," illustrates that there was no connection

12

between denial of benefits and Plaintiff's transgender status because Defendants were not on notice of "discriminatory consequences" until after the original denial of Plaintiff's requested surgeries.

Further, Plaintiff's allegations, even when read in connection with the Plan document, do not plausibly allege intentional discrimination. Plaintiff's discrimination claim is premised on the Plan "exclud[ing] otherwise medically necessary surgeries for patients who have 'undergone or are planning to undergo gender reassignment surgery.'" (Doc. # 1 ¶ 129). According to Plaintiff, because of this so-called categorical exclusion, the Plan "has drawn a classification that discriminates based on transgender status and gender non-conformity." (*Id.* ¶ 131). Plaintiff further alleges that "non-transgender employees receive coverage for all of their medically necessary healthcare, but transgender individuals do not." (*Id.* ¶ 132). This allegation is demonstrably false. The Plan itself categorizes certain surgeries as cosmetic, regardless of a participant's status as a transgender or non-transgender individual. As discussed in detail in Section III.A.2, the Plan lists certain cosmetic procedures related to improving the gender-specific appearance of a patient which will not be covered. (Doc. # 1-1 at 140). Similarly, the Plan also states that "cosmetic surgery or surgical procedures primarily for the purpose of changing the appearance of any part of the body to improve appearance or self-esteem" will likewise not be covered. (*Id.* at 142). This section, entitled exclusions and limitations, applies to every Plan participant, regardless of their sex. In fact, the Plan only allows for specific, reconstructive surgeries "to improve the function of a body part" in limited situations—such as when the malfunction is due to an accidental injury, birth defect, sickness, or following a mastectomy. (*Id.* at 136). Given the Plan's limited

13

allowance for any cosmetic procedures, regardless of a participant's status as a transgender or non-transgender individual, it cannot be inferred that by simply denying benefits to Plaintiff, Defendants were intentionally discriminating on the basis of sex. As such, Plaintiff's claim under 42 U.S.C. § 18116 is dismissed.

## IV.     CONCLUSION

Accordingly, **IT IS ORDERED** as follows:

(1)     Defendant's Motion to Dismiss (Doc. # 26) is **GRANTED**;

(2)     This matter is **DISMISSED AND STRICKEN** from the Court's active docket; and

(3)     An accompanying **JUDGMENT** shall be filed contemporaneously herewith.

This 23rd day of February, 2022.



Signed By:
*David L. Bunning*  *DB*
United States District Judge

M:\DATA\ORDERS\Cov2020\20-176 MOO.docx